NATIONAL ELEVATOR INDUSTRY
WELFARE PLAN, et al., Plaintiffs,

v.

VIOLA INDUSTRIES, INC., et al., Defendants.

Civ. A. No. 84–2286–S.

United States District Court,
D. Kansas.

April 30, 1986.

On Motion For Reconsideration
July 3, 1986.

John P. Hurley, Linda Kay Knight, Herman M. Shaffer, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., Joseph P. Boyle, O'Donoghue & O'Donoghue, Philadelphia, Pa., Thomas M. Mullinix, Evans, Mullinix and Jarczyk, Kansas City, Kan., for plaintiffs.

Richard D. Anderson, Jeffrey A. Chanay, Entz, Anderson & Chanay, Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on plaintiffs' motion for summary judgment and defendants' motion for partial summary judgment. Plaintiffs originally brought this action for damages on the grounds that defendants allegedly failed to timely and accurately report and pay contributions to plaintiff plans on certain employees, and that defendants were indebted to plaintiff plans for such delinquent contributions. Plaintiffs also sought an accounting to the plaintiff plans and allowance of the plaintiffs to conduct an audit, to compel the defendants to continue to timely and accurately report and pay current contributions to plaintiff plans, and for a calculation as to how much monies are due plaintiff plans.

For the purposes of the summary judgment motions, the following are uncontroverted facts:

1. Defendant Viola Industries–Elevator Division, Inc. [hereinafter defendant Elevator] and defendant Viola Industries, Inc. [hereinafter defendant Industries], are corporations incorporated in the State of Kansas on August 15, 1968, and December 6, 1982, respectively.

2. Defendant Elevator is known in the industry and by others as "Viola Industries."

3. Defendants are alter egos or single employers and as a result, both defendants were bound by the International Union of Elevator Constructors' standard agreement [hereinafter IUEC].

4. On December 14, 1982, defendant Industries signed the IUEC standard agreement with the International Union of Elevator Constructors. Said agreement was entered into on December 14, 1982, and was to expire July 8, 1987. The agreement provided that the signatory employer adopted and agreed to be bound by the terms and conditions of the standard agreement and agreed that all elevator constructor mechanics and helpers hired by the defendant Elevator were to be hired according to the terms and conditions of the standard agreement. The agreement recognizes the union as a bargaining representative of all elevator constructor mechanics and helpers in the employ of the

defendant engaged in the installation, repair, maintenance, and servicing of elevators and certain other equipment. The agreement also recognized the local unions as a first source of manpower, thus requiring defendants' use of the local union as a first source when in need of elevator constructor mechanics and helpers. The agreement further provided that defendants would make contributions to plaintiff plans in graduated amounts as specified in each agreement for each hour of work performed by all elevator constructor mechanics and helpers in the employ of the defendants. Bob E. Viola, as president of the defendant corporations, signed similar agreements on behalf of defendant Elevator, a 1972–77 agreement and a 1977–82 agreement, and later signed the 1982–87 agreement on behalf of the defendant Industries.

5. Defendant is engaged in the business of manufacture and installation of elevators. In December 1981 the defendant Elevator was awarded the subcontract from Lummus Construction Co. for installation of an elevator at the Getty Refining Company plant in Delaware City, Delaware. On or about January 11, 1982, Torkelson–Kellogg, Inc., awarded a subcontract to defendant Elevator for the installation of an elevator at the ASARCO, Inc., plant in Hayden, Arizona.

6. Upon the July 8, 1982, expiration of the second agreement between the defendant and the union, Bill Greer, representative of Local Union No. 94, Wichita, Kansas, contacted Bob E. Viola on or about July or August 1982 about defendant Elevator signing a new agreement.

7. On or about September 1, 1982, defendant Elevator was awarded a subcontract signed by Bob E. Viola from Brown & Root, Inc., for installation of an elevator at the Exxon plant in Mt. Belview, Texas.

8. The Exxon elevator installation job in Mt. Belview, Texas, was performed by elevator constructor mechanics and helpers of defendant Elevator during the months of October, November, and December 1982.

9. On November 18, 1982, Robert Williams, business agent of Local Union No. 5, Philadelphia, spoke on the phone with Bob E. Viola at which time Mr. Viola indicated to Mr. Williams that defendant would not need to sign a new agreement with the union because defendant had work in the south and could work for non-union contractors.

10. On November 19, 1982, Mr. Williams sent a new agreement to defendant Elevator for Bob E. Viola's signature. On or about December 2, 1982, Everett Treadway, General President of the union, sent a new agreement to defendant Elevator for Bob E. Viola's signature.

11. On December 14, 1982, Bob E. Viola signed the new agreement with the Union as Bob E. Viola, President, on behalf of Viola Industries, Inc.

12. Bob E. Viola, or any other officer, director, or other representative of defendant Elevator never informed the union or any local union that Bob E. Viola had formed the new corporation, defendant Industries.

13. The new agreement [hereinafter the 1982–87 agreement] signed by Bob E. Viola provides that the signatory employer agrees to be bound by the terms and the conditions of the standard agreement terminating at midnight on July 8, 1987. Other provisions of the 1982–87 agreement are the same as set out by the 1977–82 agreement.

14. From its incorporation in 1982 to the present, defendant Industries engaged in only two jobs, both elevator installation jobs subcontracted to it by defendant Elevator: the Getty job at Delaware City, Delaware, on December 14, 1982; and, the ASARCO job at Hayden, Arizona, on or about July 11, 1983.

15. The Getty and ASARCO subcontracts provide that defendant would furnish all materials, tools, and supervision for the respective jobs. Bob E. Viola had signed the Getty and ASARCO subcontracts on behalf of both defendant Elevator and defendant Industries. There was no solicitation of bids and no competitive bidding with respect to the Getty and ASARCO subcontracts.

16. Defendant Industries in turn subcontracted the Getty elevator installation job to General Elevator Company on or about January 5, 1983, and subsequently to the Maintenance Company, Inc. [Mainco), and subcontracted the ASARCO elevator installation job to Traylor Enterprises on or about July 11, 1983.

17. While defendant Elevator and defendant Industries were engaged in the Getty and ASARCO jobs, elevator constructor mechanics and helpers of defendant Elevator performed a air carbon elevator installation job in Seadrift, Texas, during the months of April, May, and June of 1983.

18. An elevator installation job in Elmyra, New York, was performed for National Vitamin Products Company by elevator constructor mechanics and helpers of defendants during the months of August, September, October, and November of 1983. Elevator constructor mechanics and helpers of defendant Elevator performed a capital cement elevator installation job in San Antonio, Texas, during the months of October, November, and December of 1983.

19. An audit of a contributory employer's records is authorized by plaintiffs' plan documents and has been requested by plaintiffs.

20. On or about November 4, 1983, Bob E. Viola sent a letter on defendant Industries stationery to Everett Treadway, General President of the union, in which Mr. Viola indicated that defendant Industries no longer considered its agreement with the union valid.

21. Defendant Industries has never filed any reports of employee status and work history with plaintiff plans and has never made fringe benefit contribution payments to plaintiff plans. Defendant claims it had no direct hire employees and therefore had no obligation to report or contribute to plaintiffs' fund.

22. The parties have stipulated to the union or non-union status of each 1977–82 employee as denoted on Exhibit D and pursuant to the stipulation designated as Exhibit E.

23. Plaintiff plans are multiemployer employee benefit plans as that term is contemplated under the Employment Retirement Income Security Act, 29 U.S.C. § 1001, et seq., as amended and are Taft–Hartley plans pursuant to section 302 of the Labor Management Relations Act, 29 U.S.C. § 186.

24. The trust documents of plaintiff plans provide for interest on late or unpaid contributions from the due date to the date of payment as a per annum rate of interest.

## STATEMENT OF THE LAW

To rule favorably on a motion for summary judgment, the court must first determine that the matters considered in connection with the motion disclose "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The principal inquiry is therefore whether a genuine issue of material fact exists. *Dalke v. The Upjohn Co.*, 555 F.2d 245 (9th Cir.1977); *Hanke v. Global Van Lines, Inc.*, 533 F.2d 396 (8th Cir.1976). A motion under Rule 56 will be denied unless the movant demonstrates beyond doubt that he is entitled to a favorable ruling. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir.1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir.1975). Pleadings and documentary evidence are to be construed liberally in favor of a party opposing a Rule 56 motion. *Harman v. Diversified Medical Investments Corp.*, 488 F.2d 111 (10th Cir.1973), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). However, once a summary judgment motion has been properly supported, the opposing party may not rest on the allegations of the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Coleman v. Darden*, 595 F.2d 533, 536 (10th Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). A party with evidence tending to create a factual issue must present that evidence to the trial judge or summary judgment is proper. *Otteson v.*

*United States,* 622 F.2d 516, 520 (10th Cir. 1980).

Upon a review of the record and the memorandums submitted by the parties for purposes of both the plaintiffs' motion for summary judgment and the defendants' partial motion for summary judgment, the court finds the following issues need to be resolved:

1. Whether the defendant Industries from December 14, 1982, to the present, has employed any employees working as elevator constructor mechanics and helpers engaged in installation, repair, maintenance, and servicing of elevators and other equipment referred to in the IUEC standard agreement.

2. Whether the IUEC ever achieved the status of majority representative of employees of defendants on any construction project between the execution of the standard agreement by Viola Industries, Inc., in December of 1982, and repudiation of the standard agreement on November 4, 1983.

3. Whether the agreement effective 7/8/77 through 7/8/82 and the agreement effective 12/14/82 through 7/8/89, should be characterized as a collective bargaining relationship or a pre-hire agreement. [Defendants contend that the parties did not enter into a collective bargaining relationship, but rather agreed to a short form, pre-hire agreement.]

4. Whether the IUEC obtained majority status in the relevant bargaining units in or about 1979 forward.

The court notes that the plaintiffs, in their Memorandum in support of their motion for summary judgment, devote much discussion to the issue of the alter ego doctrine and the single employer relationship of the defendants. As defendants have conceded for the purposes of this motion that it is a single employer under the National Labor Relations Act, the court finds it would be superfluous to address the plaintiffs' discussion. The court finds that there are two key issues which have not been resolved which are pivotal in the resolution of this action. The court must first determine whether the agreement signed by defendant Bob E. Viola on De-cember 14, 1982, constitutes a pre-hire agreement within the meaning of section 8(f) of the National Labor Relations Act or whether the agreement could be characterized as a collective bargaining agreement. Another key issue is whether the IUEC obtained majority status in or about 1979 and whether such status has a bearing after July 1982 when the 1977–82 IUEC agreement expired. A collateral *intertwining* issue is the dispute as to the time periods, employees jobs, and hours of individuals for which plaintiffs claim that defendants have allegedly failed to contribute.

Before discussing these issues in detail, the court must first address defendants' contention that the action of the National Labor Relations Board as to this action preempts this court from exercising jurisdiction. Defendants contend that since the N.L.R.B. is considering similar issues, this court has no subject matter jurisdiction over allegations pertaining to plaintiffs' right to any contribution arising from any obligations under sections 8(a)(5) and 9(a) of the National Labor Relations Act as amended. The defendants therefore request that all allegations pertaining to the period July 8, 1982, through the present be dismissed. The defendants further contend that the five year statute of limitations bars any action brought for failure to pay fringe benefit contributions under the 1977–82 contract which may have been due before July 17, 1979. Thus, the defendants contend that all allegations pertaining to unpaid contributions, except for the period of July 17, 1979, through July 8, 1982, should be dismissed. The court finds defendants' argument to lack merit.

■ Pursuant to section 301(a) of the National Labor Relations Act, 29 U.S.C. § 185(a), federal courts have jurisdiction to examine alleged violations of collective bargaining agreements:

Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organiza-

tions, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. 29 U.S.C. § 185(a). A section 301 claim must satisfy three requirements: (1) A claim of a violation of (2) a contract (3) between an employer and a labor organization. *Carpenters Local Union No. 1846 v. Pratt–Farnsworth,* 690 F.2d 489, 500 (5th Cir.1982). The court finds that the three requirements of section 301 have been complied with.

In a recent case, *Board of Trustees Container Mechanics Welfare/Pension Fund v. Universal Enterprises, Inc.,* 5 EBC 1143 (S.D.Ga.1983), the court discussed whether primary jurisdiction of the N.L.R.B. preempts the jurisdiction of the District Court. The court found that, "federal courts have independent jurisdiction to decide cases alleging breaches of collective bargaining agreements, even though a breach may also constitute an unfair labor practice." *Id.* at 1149. The court further stated that the District Court "has the power to make an initial determination whether or not a contract existed." *Id.* at 1150. The court therefore found that it had jurisdiction to hear the claims filed by the plaintiffs. The court finds that defendants' argument contending that the court has no subject matter jurisdiction over allegations pertaining to plaintiffs' right to any contributions arising from any obligation under sections 8(a)(5) and 9(a) of the National Labor Relations Act as amended pertaining to the period July 8, 1982, through the present is therefore meritless. *See William E. Arnold Co. v. Carpenters District Council,* 417 U.S. 12, 15–18, 94 S.Ct. 2069, 2071–73, 40 L.Ed.2d 620 (1974).

■ The court will next address defendants' contention that the five year statute of limitations bars recovery of any contributions under the 1977–82 agreement which may have been due before July 17, 1979. The federal statute provides no statute of limitations, thus the timeliness of suits brought under section 301 of the National Labor Relations Act, 29 U.S.C. § 185,

"is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations, *International Union, U.A.W. v. Hoosier Cardinal Corp.,* 383 U.S. 696, 704–05, 86 S.Ct. 1107, 1112–13, 16 L.Ed.2d 192 (1966), so long as the applicable state statute of limitations is not 'unreasonable or otherwise inconsistent with national labor policy.' " *Id.* at 706, 86 S.Ct. at 1113, *quoted in Carpenters & Millwrights Health Benefit Trust Fund v. Domestic Insulation Co.,* 387 F.Supp. 144, 148 (D.Colo.1975). In *Carpenters & Millwrights Health Benefit Trust Fund,* the court found that since the action involved a breach of the collective bargaining agreements, the appropriate statute of limitations was the general statute regarding breaches of contract. *Id.* at 148.

In *Butler v. Local Union No. 823, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America,* 514 F.2d 442 (8th Cir.1975), the appellants asserted that the actions against the employer were barred by the appropriate statutes of limitations. The Eighth Circuit in, ruling on this issue, found that it was unnecessary to determine whether the law of Missouri or Kansas governed, since both states provided a five year period for actions based on written contracts. *See* K.S.A. 60–511. In *Butler,* the court found that since there is no federal statute of limitations governing section 301 breach of contract actions, the timeliness of such suits is governed by the appropriate state statute of limitations. *Id.* at 446. In *Butler* the court found that the determination of whether or not the employer had in fact breached the collective bargaining agreement depended entirely on an interpretation of documents comprising the agreement. *Id.*

The court therefore must agree with the defendants that the five year statute of limitations governing written contract actions in Kansas, K.S.A. 60–511 (1983), must control in a section 301 action. K.S.A. 60–511 provides that "[a]n action upon any agreement, contract or promise in writing" shall be brought within five years. The court finds that the five year statute of

limitations is not unreasonable or contrary to any national federal labor policy. *See Carpenters & Millwrights Health Benefit Trust Fund*, 387 F.Supp. at 148. The court therefore finds that plaintiffs' recovery, if any, should be limited to amounts owing from July 17, 1979.

## 1977–1982 AGREEMENT

■ The court will first address the obligations owed by the defendants under the 1977–82 agreement. In addressing the issue of whether defendants timely and accurately reported and paid contributions on all elevator construction mechanics, the court notes that K.S.A. 60–511 limits our review to the period between July 18, 1979, until the agreement's expiration in July 1982.

Plaintiffs contend that defendants were obligated to report and make contributions prior to July 1982 pursuant to the terms of the 1977–82 agreement. The United States Supreme Court decision in *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 271, 103 S.Ct. 1753, 1759, 75 L.Ed.2d 830 (1983), makes clear that regardless of the characterization of an agreement between the employer and the union, when a pre-hire agreement is entered into, "both parties must abide by its terms." *See, e.g., New Mexico District Council of Carpenters v. The Mayhew Company*, 664 F.2d 215 (10th Cir.1981).

The terms of the 1977–82 agreement are uncontroverted. The agreement provides that the employer adopts and agrees to be bound by the terms and conditions of the union's standard agreement. The court therefore finds that the defendants in this case agreed to make contributions to plaintiff plans in amounts as specified in each agreement for each hour of work performed by all elevator constructor mechanics and helpers in the employ of the defendants. The defendants contend, however, that a question of fact remains as to whether defendants have timely reported and paid contributions for individuals listed in plaintiffs' Exhibit B from the time period of July 18, 1979, to July 1982. The court notes, however, that defendants do not con-

test the records themselves, but only seek to clarify the records with regards to probationary employees. The court finds that plaintiffs' request for an audit should be granted to conclusively establish defendants' compliance or noncompliance with the 1977–82 agreement. Defendants have conceded that they are obligated to meet the terms of the conditions of the International Elevator Constructors' Union agreement. As such, defendants were bound by the terms and conditions of the union's standard agreement and the Agreement and Declaration of Trust of the National Elevator Industry Welfare Plan, which provides that, "[t]he trustees may, at any time, have an audit made by a qualified representative ... of the payroll and wage records of any employer in connection with said contributions...." It is clear that under these terms defendants are obligated to comply with plaintiffs' audit request.

The court further notes that while defendants contend that the deposition of Carla Viola adequately supports a finding that the facts as to defendants' compliance are controverted, her testimony in deposition was based on defendants' records. The court therefore finds that an audit of those records should support defendants' contentions and thus resolve any issues of fact surrounding the resolution of contributions under the 1977–82 plan. Based on the foregoing discussion, the court finds that an audit should be performed for the period of July 1979 through the expiration of the agreement in July 1982.

## 1982–1987 AGREEMENT

■ It is equally clear that regardless of the characterization of the 1982–87 agreement, defendants are obligated to report and contribute for all work performed by all elevator constructor mechanics and helpers in the employ of the defendant during this period prior to repudiation in November 1983. It is uncontroverted that the defendants had no employees in June, July, August, September, and a portion of October of 1982. Therefore, it is unnecessary to audit that period of time. It is equally clear that from October 1982 on,

defendant Industries did employ elevator constructor mechanics and helpers. Therefore, an audit should be conducted to determine if defendants have met their obligations under the agreement. As the *McNeff* decision holds, once an employer signs a pre-hire agreement, it is obligated to meet the terms of that agreement. Therefore, it cannot be contested that defendants must comply with the plaintiffs' request for an audit beginning December 1982 when the 1982–87 agreement was signed. The court further finds that for the period of October to December, an audit should be performed to determine if and to what extent defendants employed elevator constructor mechanics and helpers and what obligations defendants have for that time period, if any. While the court has not addressed the issue of whether the 1982–87 agreement is a collective bargaining agreement, the court finds that the case law supports a finding that once a collective bargaining agreement is entered into between the parties, the employer has a duty to continue to negotiate with the union and abide by the terms of the agreement even upon expiration. *See Mo–Kan Teamsters Pension Fund v. Creason*, 716 F.2d 772, 775–76 (10th Cir.1983). Plaintiffs' request for an audit for the period of November 1983 to the present will later be determined after the court resolves the dispute as to the characterization of the 1982–87 agreement.

The key issue of whether the 1977–82 agreement was a collective bargaining agreement pursuant to 9(a) or was a pre-hire agreement under the language of 8(f), 29 U.S.C. § 158, will now be addressed. Both the plaintiffs and defendants agree that defendants are employers to which 8(f) of the N.L.R.A. applies. Section 8(f) permits construction industry employers to enter into collective bargaining agreements without establishing union majority status prior to making the collective bargaining agreement. Such agreements pursuant to section 8(f) are termed "pre-hire agreements." An 8(f) pre-hire agreement is subject to repudiation until the union establishes majority status. *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 271, 103

S.Ct. 1753, 1959, 75 L.Ed.2d 830 (1983). Once union majority status of the employees is obtained, the 8(f) agreement is converted into a section 9(a) collective bargaining agreement. If the 8(f) agreement is converted to a section 9(a) collective bargaining agreement, the defendants could not unilaterally renounce the 1982–87 agreement. *See N.L.R.B. v. Black*, 709 F.2d 939, 941 (5th Cir.1983). Thus, it is necessary for the court to determine if the 1982–87 agreement was a section 8(f) or 9(a) agreement. The facts do not establish that majority status was obtained after the 1982–87 agreement was signed. The defendants therefore contend that because union majority status was never met after the signing of the 1982 agreement, the agreement should be characterized as a pre-hire agreement, enabling defendants to repudiate such agreement on November 1983.

The plaintiffs argue, however, that regardless, the 1982–87 agreement was a section 9(a) collective bargaining agreement by virtue of the status of the 1977–82 agreement. Plaintiffs contend that union majority status was obtained in defendants' permanent and stable work force between the period of October 1978 and March 1980. Thus, plaintiffs argue that the 1977–82 agreement was a section 9(a) collective bargaining agreement. Stemming from this finding, plaintiffs argue that defendants were obligated to negotiate a new contract and a presumption arises as to the characterization of the 1982–87 agreement as a section 9(a) collective bargaining agreement.

Defendants argue that even if union majority status was obtained in the period from 1978–80, the only affect of such a showing is to create a rebuttable presumption of majority status until the contract of July 8, 1982, expired. Defendants further argue that defendant Elevator had no employees from June through the middle of October 1982, thus dispelling any presumption of any majority status. Defendants contend that the burden then is on the plaintiffs to prove union majority status after the 1982 agreement was signed. The

court finds that it is clear from the joint stipulation of the parties filed on August 13, 1985, that the employees of Viola Industries–Elevator Division did not obtain union majority status from August 1982 through October 1984. The court therefore finds that it must examine the union status during the period of the 1977–82 agreement. Case law must also be examined to resolve the issue of whether the achievement of a section 9(a) collective bargaining status is carried forward through to subsequent agreements. An examination of the case law proved instructive in resolving this issue.

The defendants contend that the facts do not indicate that a "permanent and stable work force" existed in the period of 1978–1980 as to justify the ruling in *Hageman*, which held that once a majority status is achieved, a presumption of majority status is maintained for the duration of the agreement. *See Hageman Underground Construction*, 253 N.L.R.B. 7, 105 L.R.R.M. 1385, 1387 (1978). The court notes, however, that defendant does not dispute the facts as submitted on plaintiffs' Exhibit D which establishes the status of each of the defendants employees during the period of time in question. The court therefore finds that defendants have not sufficiently met their burden establishing that an issue of fact exists. Furthermore, defendants' own admissions corroborate plaintiffs' contention that majority status was achieved during the period from 1978 to 1980. The parties also filed a stipulation on August 13, 1985, which lists the union or non-union status of each 1977 to 1982 employee. *See* Exhibit E (which supports a finding of majority status).

■ The court finds that the case law establishes there are two means in which a union may obtain majority status: 1) evidence of majority status on a project-by-project basis. *See Dee Cee Floor Covering*, 232 N.L.R.B. 421, 97 L.R.R.M. 1072, 1073–74 (1977); or 2) if a permanent and stable work force is established, union status is presumed at all sites and the union is not required to demonstrate majority status at each project. *Hageman Under-*

*ground Construction*, 253 N.L.R.B. 7, 105 L.R.R.M. 1385, 1387 (1980).

■ Majority status is determined by considering a number of factors, including the number of a static group of employees and transfer of employees from one job site to another upon completion of a prior job. *See Construction Erectors, Inc.*, 265 N.L.R.B. 7186, 112 L.R.R.M. 1046, 1047–48 (1982). Such majority status is not undermined by the showing of the presence of short term employees who were employed on a temporary basis. *Rayel Electric Co.*, 260 N.L.R.B. 1327, 1330, 109 L.R.R.M. 1339 (1982).

■ The stipulation of the parties and Exhibit D clearly establish that during the period of 1978 to 1980 four employees, James Loomis, Robert Sage, Donald Sage, and William Johnson, were core employees. These four core employees worked 78% of all hours worked by defendants' employees during that period. Three of the four core employees had union status. Case law therefore supports a finding that defendants did employ a stable and permanent work force. The facts further support the finding that union majority status was obtained in the permanent and stable work force. As *Hageman* dictates, it is unnecessary for the union to establish majority union status on a site or project-by-project basis once a permanent and stable work force is found.

The stipulation as to the employees' status further makes clear that at one point all four core employees and eight of the twelve other employees employed during 1978 to 1980 were union members. The court therefore finds that the uncontroverted facts establish that majority status was obtained in a permanent and stable work force employed by the defendants during the period 1978 to 1980. Thus, even if the 1977–82 agreement entered into by the parties was initially a section 8(f) pre-hire agreement, the finding of majority status in the period of 1978 to 1980 converts the agreement to a section 9(a) collective bargaining agreement.

Stemming from the court's finding that the 1977–82 agreement was converted into

a section 9(a) collective bargaining agreement, the court finds that defendants are liable for reporting and making contributions post–1982. In *Mo–Kan Teamsters Fund v. Creason,* 716 F.2d 772, 775–76 (10th Cir.1983), the court found that the presumption of majority status continues and defendant is obligated to continue abiding by its terms upon its expiration. *See also Hinson d/b/a Hen House Market, No. 3,* 175 N.L.R.B. 100, 71 L.R.R.M. 1072, 1073–74, *aff'd, Hinson v. N.L.R.B.,* 428 F.2d 133 (8th Cir.1970).

Defendants make an argument that because there was a period of four months or so after the expiration of the 1977–82 agreement in which no elevator installation jobs had been performed and no elevator constructor mechanics and helpers were employed, the presumption of majority status is clearly dissolved. The court finds that this fact alone does not dissolve the presumption of majority status or refute the characterization of the 1982–87 agreement as a collective bargaining agreement. The court finds that the absence of any constructor mechanics and helpers during the four month period should be weighed against the fact that rather than refusing to bargain with the union altogether, defendants bargained with the union and reached a subsequent agreement in December of 1982. Furthermore, the fact that defendant Industries was incorporated and acted as subcontractor to defendant Elevator also weighs in the determination of binding defendants to the terms of the earlier agreement. Defendants' contention that they were forced into signing a new agreement due to the threat of the union that would be unable to stay on one of its job sites unless it signed the agreement is no defense to the enforceability of the 1982–87 agreement. *See Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 270 n. 9, 103 S.Ct. 1753, 1758–59 n. 9, 75 L.Ed.2d 830 (1983). The court further finds that defendants have not offered any concrete evidence to rebut plaintiffs' statement that defendants did not challenge union majority status. Defendants contend that the President Bob Viola did challenge union majority status when he spoke with union agent Bill Geier and union agent Robert Williams. The court finds that this statement alone is insufficient to rebut the presumption of union majority status carrying over from the 1977–82 agreement into the 1982–87 agreement. The court therefore finds that the act of signing the 1982–87 agreement imposes upon the defendants a continuing obligation to abide by the terms and conditions of the expired 1977–82 agreement, including bargaining with the union, using the union and its local unions as a first source of elevator constructor mechanics and helpers, and payment of fringe benefits until an impasse or a new agreement regarding terms and conditions is reached. *See Hinson d/b/a Hen House Market, No. 3,* 175 N.L.R.B. 100, 71 L.R.R.M. 1072, 1074, *aff'd, Hinson v. N.L.R.B.,* 428 F.2d 133, 139 (8th Cir.1970).

While the court recognizes that the case law cited by the parties is not directly on point as to the determination whether a prior collective bargaining agreement imposes a presumption upon subsequent agreements that a collective bargaining relationship between the parties continues to exist, the case law seems to infer such a conclusion. *See Board of Trustees v. Universal Enterprises,* 751 F.2d 1177, 1184 (11th Cir.1985) (alter ego of one company functioning as a continuance of another company was bound by retroactive fringe benefit provisions when the alter ego signed a subsequent contract). In conclusion, the court finds that the 1982–87 agreement was a collective bargaining agreement as a result of the collective bargaining relationship established during the 1977–82 agreement. The court finds that the act of defendant Viola in signing the 1977–82 agreement binds the parties in a collective bargaining agreement through the period of its expiration in 1987.

The court notes that if the defendant wanted to contest its duty to comply with the union in bargaining and signing a subsequent agreement, the defendant should have sufficiently challenged majority status prior to signing the new agreement in 1982. The court finds that the defendant did not adequately rebut the presumption

that the 1982–87 agreement was a collective bargaining agreement. The court therefore finds that the 1982–87 agreement between defendant Industries and the union is a section 9(a) collective bargaining agreement. As such, the defendant remains obligated to report and contribute as per the terms and conditions of the agreement until its expiration in 1987. The 1977–82 agreement is binding upon the parties for the term of the agreement under the "contract bar" principle. *See Construction Erectors, Inc. v. N.L.R.B.*, 661 F.2d 801, 804 (9th Cir.1981). The court therefore finds that defendants continue to be obligated to timely and accurately report and pay current contributions to plaintiff plans after November 4, 1983.

The court finds that plaintiffs' motion for summary judgment should therefore be granted. Accordingly, for the reasons stated above, the defendants' motion for a partial summary judgment should be denied. The court also finds that plaintiffs' motion to place the case on the court docket or, in the alternative, for limitation by court of issues triable by jury should be denied as moot.

IT IS BY THE COURT THEREFORE ORDERED that plaintiffs' motion for summary judgment is hereby granted. IT IS FURTHER ORDERED that defendants' motion for partial summary judgment is hereby denied. IT IS FURTHER ORDERED that plaintiffs' motion to place case on the court docket or, in the alternative, for limitation by court of issues triable by jury is hereby denied as moot.

IT IS FURTHER ORDERED that plaintiffs shall conduct an audit on defendants' payroll records from the date of July 17, 1979, to the present to determine the exact amount of contributions to which plaintiff plans are entitled and the amounts for which defendants remain liable. IT IS FURTHER ORDERED that defendants shall provide to plaintiff plans whatever information or documents are necessary in order for plaintiffs to calculate the exact amount of total delinquent contributions and other monies owed by defendants. IT IS FURTHER ORDERED that the audit shall be completed and the results and exact amount of all monies owed by defendants to which plaintiff plans are entitled to be made available to this court within thirty (30) days from the date this order is filed.

IT IS FURTHER ORDERED that within twenty (20) days of the court's receipt of said audit and other monetary figures from plaintiff plans, defendants shall file any objections to these figures. Thereafter, the amount due and owing, if any, by defendants to plaintiff plans shall become final. IT IS FURTHER ORDERED that defendants are to timely and accurately report and pay current contributions to plaintiff plans consistent with their continuing obligations under the existing 1982–87 agreement until its expiration or further order of this court.

Plaintiff may serve and file a verified itemized statement of expenses, including attorneys' fees and the costs of audit and interest, at the same time the audit results are submitted to this court. Defendants may serve and file objections on such costs, attorneys' fees and interests within ten (10) days after receipt of plaintiffs' verified statement. Thereafter, the court will rule upon the issues of damages, interest, and expenses.

## ON MOTION FOR RECONSIDERATION

This matter is before the court on defendants' motion for reconsideration of the Court's Memorandum & Order dated April 30, 1986, denying defendants' motion for partial summary judgment and granting plaintiffs' motion for summary judgment.

The court will now address the individual arguments of the defendants. The court finds it did consider the significance that no employees after July 8, 1982 were union members. The court further finds that there are no material issues of fact which exist in this case precluding the court's order granting summary judgment. The court therefore finds that defendants' motion for reconsideration should be denied.

Alternatively, the defendants have requested that this case be stayed pending the determination of the issues involved by

the National Labor Relations Board [hereinafter NLRB]. In support of their request for a stay, defendants argue that the NLRB has primary jurisdiction over the question of majority status. The court finds that it had jurisdiction to determine the issues involved in the summary judgment motion. The court finds that the issue involved in the decision of *Brotherhood of Teamsters Local No. 70 v. California Consolidators, Inc.*, 693 F.2d 81, 83, (9th Cir.1982), *cert. denied*, 469 U.S. 887, 105 S.Ct. 263, 83 L.Ed.2d 199 (1984), can be distinguished from the case at hand. The court finds that the issue in this case primarily dealt with the enforcement of the bargaining agreement, not a determination of the appropriate bargaining unit. In fact, the parties stipulated to the status of its employees during the period in question. The court finds no reason which would mandate a stay in this case pending determination of the NLRB proceeding.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion for reconsideration of the Court's Memorandum & Order dated April 30, 1986, is hereby denied. IT IS BY THE COURT THEREFORE ORDERED that defendants' motion to stay this case pending the NLRB's determination is hereby denied.