979 F.2d 1384
 141 L.R.R.M. (BNA) 2729, 141 L.R.R.M. (BNA)
2738, 61 USLW 2348,
123 Lab.Cas. P 10,455, 123 Lab.Cas. P 10,456,
15 Employee Benefits Cas. 2923
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
VIOLA INDUSTRIES-ELEVATOR DIVISION, INC., and its alter ego,
Viola Industries, Inc., Respondent.
International Union Of Elevator Constructors, Intervenor.
NATIONAL ELEVATOR INDUSTRY WELFARE PLAN, National Elevator
Industry Pension Plan, and National Elevator
Industry Educational Plan, Plaintiffs-Appellees,
v.
VIOLA INDUSTRIES, INC. and Viola Industries-Elevator
Division, Inc., Defendants-Appellants.
 Nos. 88-1837, 89-3024.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 2, 1992.
Opinion on Rehearing En Banc Nov. 2, 1992.
 
 Laurence S. Zakson (Rosemary M. Collyer, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen Armstrong, Deputy Associate Gen. Counsel, Collis Suzanne Stocking, Supervisory Atty., and Margaret Gaines Bezou, Attorney), N.L.R.B., Washington, D.C., for petitioner.
 Stewart L. Entz (Richard D. Anderson with him on the brief), of Entz, Anderson, Friend & Chanay, Topeka, Kansas, for respondent.
 Francis J. Martorana (Donald J. Capuano and Sally M. Tedrow with him on the brief), of O'Donoghue & O'Donoghue, Washington, D.C., for intervenor.
 Joseph P. Boyle (Sally M. Tedrow with him on the brief), of O'Donoghue & O'Donoghue, Philadelphia, Pa., for plaintiffs-appellees.
 Richard D. Anderson of Entz, Anderson and Chanay, Topeka, Kan., for defendants-appellants.
 Before SEYMOUR, HOLLOWAY, and EBEL, Circuit Judges.
 ON APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD (No. 5-CA-15990)
 HOLLOWAY, Circuit Judge.
 
 
 1
 This case arises from two separate proceedings which have been consolidated here. The petitioner National Labor Relations Board (the Board) has brought the first of these proceedings (No. 88-1837) to enforce its order based on the finding that the respondents Viola Industries-Elevator Division, Inc. and Viola Industries, Inc. (collectively, Viola Industries) violated sections of the National Labor Relations Act (the Act) by not honoring a Section 8(f) prehire agreement entered into with the International Union of Elevator Constructors (the I.U.E.C. or the Union). The Union was the charging party and is a party in this enforcement proceeding as an intervenor.
 
 
 2
 The National Elevator Industry Welfare Plan, the National Elevator Industry Pension Plan, and the National Elevator Industry Education Plan (the Plans) were the plaintiffs in a related district court suit brought to recover contributions alleged to be owed to the Plans by Viola Industries under the repudiated agreement with the Union. The district court found for the Plans, 684 F.Supp. 1548, 684 F.Supp. 1560, and an appeal by Viola Industries to this court followed (No. 89-3024).
 
 
 3
 The cases have been consolidated for argument, and oral arguments were made to a panel of this court. Because we felt that the cases raised important questions implicating previous decisions of the Supreme Court and of this court, we requested briefing and argument before the court en banc in both No. 88-1837 and No. 89-3024. The primary issues in both cases have been disposed of by the en banc opinion filed today. In this opinion we resolve the remaining issues.
 
 
 4
 The facts and the proceedings below have been well summarized in the en banc opinion. There the court determined that the Deklewa doctrine prevents Viola Industries from unilaterally repudiating its prehire agreement with the Union. The en banc court did not, however, rule on Viola's claim that it cannot be bound by the contract because it was improperly coerced into signing it. Nor did the en banc court rule on Viola's challenges to the auditor's report on which the district court based its findings of the amount of money owed to the Plans. It is these issues which we address here.
 
 
 5
 * In the enforcement proceeding, Viola Industries contends that the Union coerced it into making the prehire agreement and that therefore the agreement should not be enforced in any event. The core of the claim is that the Union pressured two subcontractors into refusing to work for the firm until it signed the prehire agreement with the Union.
 
 
 6
 As the Administrative Law Judge found, we need not reach the merits of this claim because it is time barred under Section 10(b) of the Act. See 29 U.S.C. § 160(b). Section 10(b) requires that any unfair labor practice claim be asserted within six months after it arises. The time bar has been interpreted to apply to affirmative defenses such as coercion as well. See Land Equip. Inc., 248 N.L.R.B. 685, 685 n. 2 (1980), enforced, 649 F.2d 867 (9th Cir.1981); N.L.R.B. v. Marin Operating, Inc., 822 F.2d 890, 893 (9th Cir.1987). The unfair labor practice charge in this case was filed on November 14, 1983. The alleged coercion must have occurred before the prehire agreement was signed on December 14, 1982. Thus the affirmative defense to enforcement based on the alleged unfair labor practice of coercion is time-barred.
 
 II
 
 7
 In its appeal from the district court, Viola Industries makes four basic objections to the damage calculations used by the auditor and accepted by the district judge. Viola Industries maintains that the auditor improperly included hours worked by employees who only worked inside plant and so were not elevator constructors under the agreement. Second, it argues that some employees who were actual elevator constructors occasionally worked at the Viola Industries plant and that these "shop hours" were not covered by the contribution requirement of the agreement. Third, Viola Industries claims that the auditor failed to exclude the inexperienced mechanics' "probationary hours" for which contributions were not owed according to the agreement. Lastly, Viola Industries objects to the inclusion of hours spent installing elevator doors and manlifts. It says that these are tasks traditionally done by ironworkers and millwrights and so are not within the work jurisdiction of the union.
 
 
 8
 Insofar as Viola Industries challenges findings of fact by the district court, the question for this court under Rule 52(a) "is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [the appellate court] is left with the definite and firm conviction that a mistake has been committed.' " Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We can overturn the district court's factual findings only if we hold them clearly erroneous. Salve Regina College v. Russell, --- U.S. ----, ----, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991).
 
 
 9
 The challenge to the inclusion by the auditor of hours of five alleged "plant workers" is strong. A serious argument is made by Viola Industries that these workers (Moon, Bertelson, Stultz, McIntire and Wood) never did work in the field and that they worked only in the plant. Work in the field was covered by the agreement. Work in the plant was not. Viola's attack is based on affidavits of two of the workers, Bertelson and Wood, and on time records and testimony of Mrs. Viola, the company bookkeeper. III R. 58. Mrs. Viola testified that the five men punched in daily and had time records therefor, and her direct testimony was that she saw those individuals every day. Id. at 58-60.
 
 
 10
 The only testimony contradictory to that of Mrs. Viola and to the affidavits and records was the auditor's testimony. His assumption was that because he had requested that Viola Industries send him printouts which only included reportable hours, and the printouts he received listed the five workers' hours, he should include the workers in his report of liability to the Plans. The trial judge made no independent finding concerning this liability and instead made a general adoption of the conclusions of the auditor. He did inquire whether the testimony and records would cause the auditor to make any substantial changes in his report. The auditor replied in the negative. The judge then adopted the auditor's report without any detailed findings and conclusions otherwise.
 
 
 11
 Considering all the evidence on this issue, we have a definite and firm conviction that a mistake was made in the imposition of liability respecting these five workers. The direct, specific and corroborated testimony of Mrs. Viola is not contradicted by any direct proof. Accordingly we must hold that the awards respecting these five plant employees should be vacated.
 
 
 12
 Next, Viola Industries contends that there was error in that "[some] work performed was not covered work as defined in the I.U.E.C. Agreement" yet that work was included in the auditor's report of hours for which contributions were owed. Specifically Viola alleges that employees "such as James Van Horn and L. Mark Fiske" did some covered work in the field but were brought "into the plant for short periods" when there was no more work in the field. Brief of Appellants at 26.
 
 
 13
 We have already noted the auditor's testimony that he made his determinations on the basis of records furnished by Viola Industries. Insofar as the records themselves were deficient, in such litigation "[a]n employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind his failure to keep records as statutorily required." Brick Masons Pension Trust v. Industrial Fence & Supply, 839 F.2d 1333, 1338 (9th Cir.1988). The court's findings concerning these "shop hours" are not shown to be clearly erroneous.
 
 
 14
 Further, Viola Industries claims error in the auditor's failure to allow deductions for probationary periods for four employees. Brief of Appellants at 27-28. We disagree. Probationary hours are the first hundred hours worked by an elevator constructor novice. The auditor testified that he requested information specifically relating to probationary employees and that he had not received the detailed reports necessary for determining which hours were probationary. III R. 32. The auditor testified that Viola Industries designated certain people as being I.U.E.C. probationary for the year 1982 and that he excluded those people without further explanation in later years. Id. at 32. All other hours were assumed to be not probationary. At the hearing there were contradictory affidavits and testimony supporting the company's claim for deductions for additional probationary employees. The court weighed this evidence and entered its ruling. The findings on this aspect of the audit are not shown to be clearly erroneous.
 
 
 15
 Finally, there remains the issue of the inclusion of hours spent installing manual doors and cage and belt lifts. There was conflicting testimony as to whether such work was traditionally within the work jurisdiction of the union. See Tr. at 90 (Testimony of Bob Viola); Doc. 134, Ex. 1 (Deposition of Jerome Mullett). The issue is thus a controverted question of fact. The resolution of such conflicts is exclusively the province of the district court. Raydon Exploration, Inc. v. Ladd, 902 F.2d 1496, 1499 (10th Cir.1990). We cannot say that the findings on this matter are clearly erroneous.
 
 III
 
 16
 On the basis of the determinations made in this panel opinion respecting both the enforcement proceeding (No. 88-1837) and the appeal from the United States District Court for the District of Kansas (No. 89-3024), and in light of the conclusions reached in our en banc opinion, the judgments in both of said proceedings are announced and entered by the en banc opinion filed herewith.
 
 OPINION ON REHEARING EN BANC
 
 17
 Nov. 2, 1992.
 
 
 18
 The petitioner National Labor Relations Board (the Board) has brought the first of these proceedings (No. 88-1837) to enforce its order based on the finding that the respondents Viola Industries-Elevator Division, Inc., and Viola Industries, Inc. (collectively, Viola Industries[1]), violated sections of the National Labor Relations Act (the Act) by not honoring a Section 8(f) prehire agreement entered into with the International Union of Elevator Constructors (the I.U.E.C. or the Union). The Union was the charging party and is a party in this enforcement proceeding as an intervenor.
 
 
 19
 The National Elevator Industry Welfare Plan, the National Elevator Industry Pension Plan, and the National Elevator Industry Education Plan (the Plans) were the plaintiffs in a related suit in the United States District Court for the District of Kansas, brought to recover contributions alleged to be owed to the Plans by Viola Industries under the repudiated agreement with the Union. The district court found for the Plans and an appeal by Viola Industries to this court followed (No. 89-3024).
 
 
 20
 The proceedings were consolidated, and oral arguments were made to a panel of this court. Because the cases raised important issues implicating previous decisions of the Supreme Court and of this court, on our own motion we requested briefing and argument before the full court sitting en banc on the following question:
 
 
 21
 In light of the Supreme Court's decisions in Jim McNeff, Inc. v. Todd, 461 U.S. 260 [103 S.Ct. 1753, 75 L.Ed.2d 830] (1983), and NLRB v. Iron Workers, 434 U.S. 35 [335, 98 S.Ct. 651, 54 L.Ed.2d 586] (1978), and the prior opinions of this court, should this court uphold the Board's application of its Deklewa decision on No. 88-1837 and the application of the Deklewa decision by the district court in No. 89-3024?
 
 
 22
 The cases will both be disposed of by this opinion and by the opinion of the original panel filed herewith.
 
 
 23
 * The central facts of the controversy are well laid out in the opinions of the Board and the district court. Viola Indus.-Elevator Div., Inc., 286 N.L.R.B. 306, 126 L.R.R.M. 1198 (BNA) (1987); National Elevator Indus. Welfare Plan v. Viola Indus., Inc., 684 F.Supp. 1548 (D.Kan.1986). We will outline only the most salient points here.
 
 
 24
 Viola Industries-Elevator Division is in the business of installing and servicing elevator equipment at a number of locations throughout the country. In 1972 Viola Elevator entered into a prehire contract with the Union. A prehire agreement is an arrangement unique to the construction industry in which an employer enters into an agreement with a union before the union has been designated or selected as the representative of the workforce. This kind of arrangement is necessitated by the relatively short duration of many construction projects. The 1972 prehire agreement between Viola Industries and the Union expired in 1977, at which time the parties entered into a second agreement. After the expiration of the second agreement on July 8, 1982, the local union contacted Bob Viola in July or August 1982 about signing a new agreement.
 
 
 25
 In the interim, Viola Elevator had been awarded the contract for the installation of elevators in a new building in Delaware. In a number of conversations between representatives of the Union and Viola Elevator, Viola assured the Union that the company would itself only be constructing elevators for this project and that it would subcontract all installation work. Since the Delaware project was intended to be all-union, the Union suggested a number of unionized subcontractors for Viola Industries to contact to perform the installation. Viola Industries was unable to persuade any of the subcontractors to agree to do the work.
 
 
 26
 After further conversation with the Union, Viola Industries signed a third fiveyear prehire agreement on December 14, 1982, effective until July 8, 1987. Viola Industries subsequently performed work installing elevators on a number of projects. On November 4, 1983, Viola Industries repudiated the third prehire agreement by a letter from Bob Viola to E.A. Treadway, general president of the intervenor, the I.U.E.C.
 
 
 27
 The Union filed its initial charge with the Board on November 4, 1983. In the charge it accused Viola Industries of violating Section 7 of the Act by repudiating the agreement, of failing to recognize the collective bargaining agent, and of failing to pay wages and benefits provided for by the agreement. The complaint was later amended to include charges of discrimination against union members in hiring in violation of Section 8(a)(1) and (3) of the Act and of refusing to bargain collectively in violation of Section 8(a)(1) and (5).
 
 
 28
 In a March 1985 decision the Administrative Law Judge (the ALJ) found that the Union had attained the support of the majority of Viola Elevator's employees sometime between 1978 and 1980. Under governing precedent at the time, the Union thus retroactively converted into the full-fledged bargaining representative of Viola Industries' employees. Therefore the 1982 agreement, rather than being a voidable prehire agreement as then existing law would otherwise have provided, was a fully enforceable collective bargaining agreement which Viola Industries had no right to repudiate. Viola Industries was accordingly ordered to abide by the agreement and to pay back wages and benefits it owed to employees as a result of its repudiation of the contract.
 
 
 29
 In the interval between the decision of the ALJ and the appeal of his ruling to the Board, the Board decided John Deklewa & Sons, 282 N.L.R.B. 1375 (1987), enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). There the Board explicitly overruled its prior interpretation of Section 8(f) of the National Labor Relations Act. The Third Circuit thus summarized the new interpretation of Deklewa as follows:
 
 
 30
 The Board then fashioned a new interpretation of § 8(f) which sought to accommodate both employers' and employees' interests. In response to the construction industry employees' concerns, that R.J. Smith permitted management to void prehire agreements at will, the Board held that § 8(f) agreements were no longer unilaterally voidable, and that until expiration they would be enforced by the Board. The Board also responded to construction industry employers' complaints that the "conversion doctrine", by which a pre-hire agreement is converted into a standard collective bargaining agreement, effectively operated to force them, unlike all other employers, to bargain with a union whose majority status had never been established. The Board in its present order, which we review here, abandoned the "conversion doctrine," and held that § 8(f) pre-hire agreements were only enforceable during the term of the agreement and could not be converted into traditional collective bargaining agreements with lingering rights and obligations absent an election and certification.
 
 
 31
 843 F.2d at 775. The Board also announced that it "will apply the Board's new 8(f) principles to the case and to all pending cases in whatever stage." 282 N.L.R.B. at 1389.
 
 
 32
 Applying Deklewa to the Viola case before it, the Board found that the prehire agreement was binding and could not lawfully be repudiated by either party. Viola, 286 N.L.R.B. at 307. The Board found it unnecessary to pass on the ALJ's finding of majority status in light of its Deklewa decision. Id. at 306 n. 4. It found that by failing to abide by the 1982 collective bargaining agreement and by repudiating it in November 1983, Viola Industries had violated Section 8(a)(5) and (1) of the Act. The Board ordered Viola Industries to cease and desist from the violations and to make whole the employees of Viola Industries, inter alia. The Board now seeks enforcement of that order in No. 88-1837.
 
 
 33
 During the litigation before the Board, the Plans brought suit in the federal district court in Kansas to require Viola Industries to pay them monies they claim that Viola Industries owes by virtue of the firm's various agreements with the Union. The suit was brought pursuant to section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), and sections 504 and 515 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1134 and 1145. The Plans moved for summary judgment and Viola Industries filed a cross motion for partial summary judgment. In a memorandum opinion and order the district court granted summary judgment for the Plans, holding that since the Union's majority status was established for a period late in the term of the second prehire contract, the Union was presumed to still have majority support during the negotiations surrounding the third agreement. National Elevator Indus. Welfare Plan v. Viola Indus., Inc., 684 F.Supp. 1548, 1557 (D.Kan.1986). The contract thus could not be repudiated. The court ordered the union to conduct an audit of the monies owed.
 
 
 34
 This ruling was reconsidered by the district court on motion of Viola Industries in light of the Board's intervening decision in Deklewa. The court determined that under the new rule there could be no presumption of the Union's majority status which would carry over into the third agreement, but that the agreement was nevertheless binding because of Deklewa 's elimination of the employer's right of repudiation. The court thus found Viola Industries liable for contributions to the fund from December 14, 1982, to the end of the third agreement and ordered an audit. National Elevator Indus. Welfare Plan v. Viola Indus., Inc., 684 F.Supp. 1560, 1562-63 (D.Kan.1987).
 
 
 35
 After the auditor's report was complete, a hearing was held and Viola Industries was given the opportunity to brief its objections to the report. The objections, repeated in Viola Industries' brief here, were largely denied. Memorandum Decision and Order at 2. Judgment was granted for the Plans for the full amount suggested by the auditor's report--$340,321.25. Viola Industries timely appealed the district court's summary judgment and the judgment for monetary recovery by the Plans to this court.
 
 
 36
 The court en banc decides in this opinion the issues underlying the question stated earlier in this opinion which we posed on our own motion and had briefed and argued. The remaining issues in the enforcement proceeding and in the district court suit will be disposed of by the panel opinion filed herewith.
 
 II
 
 37
 Viola Industries has made similar arguments in both cases before us concerning the Deklewa ruling. It maintains that Deklewa was an improper interpretation of the National Labor Relations Act, and that even if proper the decision should not be applied retroactively to those who have relied on the old rule. Viola Industries relies heavily on Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), and our prior opinions in Jordan & Nobles Construction Co. v. New Mexico District Council of Carpenters, 802 F.2d 1253 (10th Cir.1986); Trustees of the Colorado Statewide Iron Workers (Erector) Joint Apprenticeship and Training Funds v. A. & P. Steel, Inc., 812 F.2d 1518 (10th Cir.1987); and Trustees of Wyoming Health and Welfare Plan v. Morgan & Oswood Construction Co., Inc., 850 F.2d 613 (10th Cir.1988).
 
 
 38
 On review, if the Board's resolution of conflicting interpretations represents a defensible construction of the statute, it "is entitled to considerable deference." N.L.R.B. v. Local Union No. 103, International Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978) (Higdon ). Moreover, an agency "is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes." Id. at 351, 98 S.Ct. at 661. However, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). Of course, the Board's findings of fact are conclusive if they are supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).
 
 
 39
 * Under the basic provisions of the Act, employers are forbidden to bargain with a union which has not been "designated or selected by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a). Originally, a union could establish its Section 9(a) status only through voluntary recognition or formal certification. Serious problems arose, however, when these general principles were applied to the construction industry. In that industry, Congress found that "[j]obs are frequently of short duration," considerable periods of time often separate jobs, and an "individual employee typically works for many different employers and for none of them continuously." S.Rep. No. 187, 86th Cong., 1st Sess. (1959), reprinted in, 1959 U.S.Code Cong. & Admin.News 2318, 2344.
 
 
 40
 Consequently Congress amended Section 158 of the Act in 1959, providing in Section 8(f), inter alia, that it is not an unfair labor practice under subsections (a) and (b) of the section for a construction employer to enter into a collective bargaining agreement with a union whose members are building and construction employees when the union has not established its "majority status ... under the provisions of Section 9 prior to the making of such an agreement." Such an agreement would not bar a petition for a representation election. The amendment validated the existing practice of prehire agreements. Although Section 8(f) clearly removed the restrictions against construction industry prehire agreements, it did not expressly state how these agreements were to be treated under the other provisions of the Act.
 
 
 41
 The question of how Section 8(f) related to other provisions of the Act was addressed by the Board in R.J. Smith Construction Co., 191 N.L.R.B. 693 (1971), order set aside and case remanded sub nom. Local No. 150, International Union of Operating Engineers v. N.L.R.B., 480 F.2d 1186 (D.C.Cir.1973), and in Ruttman Construction Co., 191 N.L.R.B. 701 (1971). Under the doctrine developed in R.J. Smith and Ruttman, a § 8(f) prehire agreement was merely a preliminary step which contemplated further action in the development of a full bargaining relationship. Ruttman, 191 N.L.R.B. at 702. During this preliminary stage there was no presumption of majority status which would protect the signatory union from challenge during the contract's term. The agreement itself could be repudiated by either party at any moment and could not be enforced through the provisions of Sections 8(a)(5) and 8(b)(3). 29 U.S.C. § 158(a)(5) and (b)(3).
 
 
 42
 However, a prehire agreement could convert into a full Section 9(a) relationship/agreement upon a showing that the signatory union enjoyed majority support, during a relevant period, among an appropriate unit of the signatory employer's employees. Deklewa, 282 N.L.R.B. at 1378. The R.J. Smith decision prevailed for seventeen years until it was replaced by Deklewa, which made prehire agreements fully binding and enforceable throughout their term.
 
 B
 
 43
 In the instant case Viola Industries' objections to enforcement of the Board's order begin with its challenge to the Deklewa ruling of the Board. Essentially Viola Industries argues that the Board improperly devised in Deklewa the fictitious notion of a limited Section 9(a) representative status, enforceable through a Section 8(a)(5) contract enforcement mechanism for a prehire Section 8(f) agreement. The enforceability of such a prehire agreement was addressed in Higdon and Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), which held that the Union could enforce obligations under a prehire agreement before its repudiation; However, in Higdon and McNeff, the Supreme Court recognized that absent majority credentials, the collective bargaining relationship and the Union's entitlement to act as exclusive agent had never matured. Higdon, 434 U.S. at 346, 98 S.Ct. at 658. Thus Viola Industries concludes that the Board exceeded its statutory authority by granting so-called "limited" Section 9(a) status upon the mere signing of a prehire agreement, and that the rule disallowing repudiation was inconsistent with congressional intent that prehire relationships remain voidable until full-fledged majority status under Section 9(a) attaches.
 
 
 44
 To support its claim that this court should not apply Deklewa 's prohibition against repudiation, as noted Viola Industries cites as binding authority the Supreme Court's McNeff opinion and the previous opinions of this court in which we upheld the rights of the parties to repudiate prehire agreements absent majority status.
 
 
 45
 McNeff was preceded by Higdon and we first focus on Higdon. There the Court upheld a decision of the Board which relied on the Board's earlier R.J. Smith decision. The Court made it clear that it upheld the decision because "[t]he Board's resolution of the conflicting claims in this case represents a defensible construction of the statute and is entitled to considerable deference." Higdon, 434 U.S. at 350, 98 S.Ct. at 660. It stressed that even when an agency has changed its mind, the courts "should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes." Id. at 351, 98 S.Ct. at 661. The Court concluded that "the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." Id. at 341, 98 S.Ct. at 656. On the framework of this analysis, the Court upheld the Board's decision which relied on R.J. Smith.
 
 
 46
 McNeff does not discuss the deference due to a Board decision or reason that its construction in R.J. Smith was a defensible interpretation of the Act. However, McNeff does rely on Higdon expressly and repeatedly and gives no indication of any reexamination of the Court's approach to its review function in such cases. See McNeff, 461 U.S. at 265-271, 103 S.Ct. at 1756-59. And importantly, since McNeff the Court has again emphasized the general principle articulated in Higdon, 434 U.S. at 350, 98 S.Ct. at 660, that where "[t]he Board's resolution of the conflicting claims ... represents a defensible construction of the statute [it] is entitled to considerable deference." In Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984), in the context of reviewing an E.P.A. interpretation of the Clean Air Act expressed in a legislative regulation, the Court stated:
 
 
 47
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 48
 (footnotes omitted).
 
 
 49
 And the Court in Chevron, 467 U.S. at 844, 104 S.Ct. at 2782-83, noted that the principle of deference to administrative interpretations'has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations....'
 
 
 50
 Moreover, in administrative adjudicatory proceedings courts "will uphold a Board rule so long as it is rational and consistent with the Act." N.L.R.B. v. Curtin Matheson, 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990).
 
 
 51
 Considering McNeff and Higdon against the background of the Court's decisions applying the deferential standard of review, it seems quite unlikely that the Court would so explicitly apply deference in Higdon and cases that have followed and yet adopt and apply a different, less deferential standard sub silentio in McNeff. Reading the cases together, we are persuaded that the Court's analysis in McNeff should not be viewed as adopting a new approach at variance with the rule of deference in reviewing Board interpretations of the Act. See C.E.K. Industrial Mechanical Contractors v. N.L.R.B., 921 F.2d 350, 357 (1st Cir.1990). Thus McNeff does not represent an independent and conclusive interpretation of the statute which bars our application of Deklewa here.
 
 
 52
 Similarly, our opinions in Jordan & Nobles, Colorado Statewide Iron Workers, and Wyoming Health do not prevent us from adopting Deklewa should we hold it to be reasonable. The three cases all uphold the R.J. Smith repudiation doctrine. However, they all rely on McNeff, and since McNeff does not bar our adoption of Deklewa, neither do our opinions which depend on McNeff.[2] Accordingly, we are convinced that neither McNeff nor the previous precedents of this court hold that the R.J. Smith rule was the only reasonable interpretation of the statute. On reassessment in light of its experience in the administration of the Act, the Board has adopted its Deklewa interpretation which we may now proceed to consider.
 
 C
 
 53
 We are persuaded that in light of the language of the Act, the Deklewa ruling was a defensible construction of the Act, after reassessment of the statute in view of the Board's experience with prehire agreements. Section 8(f), 29 U.S.C. § 158(f), provides in pertinent part that:
 
 
 54
 It shall not be an unfair labor practice ... for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction industry employees are members ... because (1) the majority status of such labor organizations has not been established under the provisions of section 9 of the Act prior to the making of such agreement ... Provided ... That any [such] agreement shall not be a bar to a petition [for a representation election] filed pursuant to section 9(c)....
 
 
 55
 This language is amply supportive of the revised interpretation of the Act made in Deklewa. The Board distilled the Deklewa ruling in its opinion in the instant case as follows, 286 N.L.R.B. at 306:
 
 
 56
 In Deklewa, the Board announced the following principle with respect to 8(f) contracts: such contracts are enforceable through the mechanisms of Sections 8(a)(5) and 8(b)(3), and the Union therefore enjoys a 'limited' 9(a) status during the term of such a contract; they are not bars to the processing of valid representation petitions filed under Section 9(c) and Section 9(e); the appropriate unit normally will be the single employer's employees covered by the 8(f) agreement; and on expiration of an 8(f) agreement, the signatory union will enjoy no presumption of majority status and either party may repudiate the 8(f) bargaining relationship.
 
 
 57
 We feel that the Third Circuit's views in International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. N.L.R.B., 843 F.2d 770 (3d Cir.1988), upholding the Deklewa decision, are particularly persuasive.[3] As that opinion noted, the earlier Supreme Court opinions concerning the R.J. Smith interpretation by the Board merely reviewed the Board's prior interpretation; the Court did not adopt as definitive and binding the R.J. Smith view of the statute in Higdon, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), or in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983). Furthermore, the language of Section 8(f) does not require allowing either party to unilaterally repudiate a Section 8(f) prehire agreement; instead the language of the Act in broad terms indicates an intent to legitimate and make enforceable the earlier bargaining, referral, hiring and employment practices previously found unlawful. International Ass'n of Bridge, Structural & Ornamental Iron Workers, 843 F.2d at 777. Furthermore, the overarching objectives of the Act of promotion and protection of employee free choice and labor relations stability are not served, the Deklewa opinion pointed out, by the R.J. Smith rule granting unilateral repudiation rights to an employer who voluntarily enters into a collective bargaining agreement. Id. at 778.
 
 
 58
 Viola Industries claims that review of the Board's order presents a question "whether the Board's sharp departure from precedent" was a defensible contrary reinterpretation of the Act. It stresses the prior decision in Higdon, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), upholding the earlier interpretation of the statute. The bare fact of a "departure" does not condemn the Board's Deklewa ruling, however. As the Higdon decision itself notes, "[a]n administrative agency is not disqualified from changing its mind." Id. at 351, 98 S.Ct. at 660. With more experience, the Board arrived at its Deklewa decision, and we hold that it reasonably construed the Act in so doing.
 
 
 59
 In its appeal from the district court Viola Industries makes an additional, unusual pair of arguments. Viola Industries argues that the district court was wrong to apply Deklewa's elimination of the right of unilateral repudiation. Yet it also argues that the district court was right to apply Deklewa 's rejection of the conversion doctrine. It contends that there is a critical distinction between representation issues, concerning which the courts should defer to the Board, and contract issues, for which federal courts are free to develop their own common law. Thus, in Viola Industries' view, this court should accept that part of Deklewa which would not permit the Union to convert into the full-fledged bargaining agent for Viola Industries' workers simply because the Union achieved majority status for a period during the second agreement. At the same time Viola Industries says that we must reject that part of Deklewa which runs contrary to those Tenth Circuit precedents which have previously allowed the unilateral repudiation of prehire agreements.
 
 
 60
 The distinction which Viola Industries would have us make in our degree of deference owed to the rulings of the Board is untenable. For support of this "critical distinction" Viola Industries relies on McNeff heavily. There the Court did distinguish between representation issues and contract issues, 461 U.S. at 267, 103 S.Ct. at 1757, but this was in the context of whether both types of questions were litigable in § 301 actions. Whether a court or the Board should decide a question of law is an entirely separate issue from what substantive law a court should apply if it decides the issue. The Court in Higdon nowhere suggested that the deference courts owe to the Board's interpretation of the Act should be greater for some administrative interpretations than for others. We are not persuaded to create such a distinction here.
 
 D
 
 61
 Having held that the Board's Deklewa decision is a defensible interpretation of the Act, we turn to the question whether the new interpretation is to be applied retroactively to cases in which the operative facts arose prior to the decision in Deklewa. Several Circuits have addressed the question of whether a new rule announced by an administrative agency in adjudicatory proceedings is to be applied retroactively and have upheld retroactive application unless manifest injustice would result.[4] This was the test applied by the Third Circuit in its review proceedings in Deklewa, International Ass'n of Bridge, Structural & Ornamental Iron Workers, 843 F.2d at 781, and we hold it to be the proper test also. Applying that test, we agree with the Third Circuit that the Board's determination to apply its new Section 8(f) principles "to all pending cases in whatever stage," 282 N.L.R.B. at 1389, should be upheld.
 
 
 62
 Viola Industries' main arguments against applying Deklewa retroactively are that it would work injustice here because the company was induced by coercion to sign the agreement and the agreement was not entered into by a union representing a majority of the workers. Even if the factual bases of these claims are true, these are not actually arguments against retroactive application. The injustice involved in enforcing an agreement which a party was coerced into signing has nothing to do with the frustration of expectations involved in retroactive application of the Deklewa rule.[5] Furthermore, although the problems associated with validating an agreement entered into by a union which does not enjoy majority support are real, they too are not a result of Deklewa 's retroactive application. They are present in all applications of Deklewa whether retrospective or prospective and have already been weighed in the process of formulating the Deklewa principle.
 
 
 63
 Second, Viola Industries says we should not apply Deklewa retroactively because it is an abrupt departure from the prior law upon which unions and employers have relied. We disagree. It is true that Deklewa is a sharp departure from prior law and its retroactive application will frustrate in part the expectations of those who relied upon the earlier rule in R.J. Smith; they will not be able to repudiate the prehire agreement. However, these frustrated expectations will not in general amount to manifest injustice. As the Third Circuit pointed out when it granted enforcement to Deklewa with retroactive application, by eliminating the right to repudiate prehire contracts the Board is only holding employers and unions to the essential terms of agreements which they themselves negotiated and accepted. 843 F.2d at 781.
 
 
 64
 Those courts which have declined to apply the Deklewa rule retroactively have often done so when it would amount to a penalty for actions which were legal when taken. C.E.K. Industrial Contractors v. N.L.R.B., 921 F.2d 350, 358 (1st Cir.1990); Mesa Verde Construction v. Northern California District Council of Laborers, 895 F.2d 516, 519 (9th Cir.1989). The district court's judgment here does include double interest on the amounts owed as provided for by 29 U.S.C. § 1132(g)(2). However, such double interest has been held not to be a penalty but rather a form of liquidated damages. Central States, Southeast and Southwest Areas Pension Fund v. Alco Express Co., 522 F.Supp. 919, 929 n. 12 (E.D.Mich.1981); see also Painters District Council No. 3 Pension Fund v. Johnson, 566 F.Supp. 592, 599 (W.D.Mo.1983); but see N.L.R.B. v. W.L. Miller Co., 871 F.2d 745, 749-750 (8th Cir.1989) (finding that it would be manifestly unjust to award a portion of interest retroactively). We feel there is not an unjust penalty in the remedies formulated by either the Board or the district court here.
 
 
 65
 Finally, many courts have held the existence of majority status to be an important factor in deciding whether to apply Deklewa retroactively. See C.E.K. Mechanical, 921 F.2d at 358. Indeed, in this case Viola's claims that retroactive application of Deklewa would be unjust is undercut by the fact that the ALJ found that the Union had achieved majority status and that the 8(f) agreement accordingly was converted into an enforceable agreement. Thus regardless of whether Deklewa is applied retroactively here the contract may not be repudiated. There can therefore be no manifest injustice in retroactivity. We hold that the Board appropriately applied the Deklewa rule retroactively in this case.
 
 III
 
 66
 In sum, we are convinced that we should uphold the Board's application here of its Deklewa decision. We are persuaded to accept the Board's reconsideration of the former R.J. Smith decision, with which we had agreed, because of the Board's convincing Deklewa decision and the decisions of the five circuits which have upheld the Deklewa principles. See note 3, supra. With respect to our prior opinions in Jordan & Nobles, Colorado Statewide Iron Workers, and Wyoming Health, which upheld the Board's earlier R.J. Smith rule, we hold that those opinions and the Supreme Court cases upon which they rely do not bar application of the Deklewa decision, which we here apply retroactively. Insofar as there may be any inconsistency between those three prior opinions of this court and our decision here upholding the application of Deklewa, those prior opinions are accordingly modified.
 
 
 67
 In No. 88-1337, the petition of the National Labor Relations Board is granted and the order of the Board will be ENFORCED. In No. 89-3024, the summary judgment granted for the Plans is AFFIRMED. Due to rulings also detailed in the panel opinion filed herewith, the district court's monetary judgment is VACATED with respect to the awards for employees Moon, Bertleson, Stultz, McIntire, and Wood, and the district court shall modify its judgment to exclude the liability imposed on the Plans respecting these employees. In all other respects the judgment for monetary relief is AFFIRMED.
 
 
 68
 BALDOCK, Circuit Judge, dissenting.
 
 
 69
 My concern in this case transcends the specific point of labor law at issue. I have no doubt that the construction given to § 8(f) by the National Labor Relations Board in John Deklewa & Sons, 282 NLRB 1375 (1987), enf'd sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB ("Deklewa"), 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988), and applied by the majority here, is a "defensible construction" of the statute, notwithstanding the Supreme Court's recognition that the polar opposite construction as also defensible. See NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers ("Higdon"), 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). Nor do I have any quarrel with the proposition that the Deklewa construction of § 8(f), borne out of the NLRB's "cumulative individual and institutional expertise," more effectively achieves the "overarching objectives" of the National Labor Relations Act to promote and protect employee free choice and labor relations stability than the prior construction given to § 8(f) in R.J. Smith Construction Co., 191 NLRB 693 (1971), enf. denied sub nom. Operating Engineers v. NLRB, 480 F.2d 1186 (D.C.Cir.1973). See Deklewa, 843 F.2d at 778-79. Rather, my concern relates to the separation of power between the judiciary and the executive branches of our government, see Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers, 861 F.2d 1124, 1146-49 (9th Cir.1988) (en banc) (Kozinski, J., dissenting), and the majority's willingness to revise, ultra vires, the Supreme Court's opinion in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), in order to avoid this substantial constitutional question.
 
 
 70
 If Higdon were the only statement from the Supreme Court of § 8(f)'s meaning, I would gladly bow in deference to the NLRB's contrary, albeit defensible, Deklewa construction. Higdon involved an unfair labor practices action brought before the NLRB by an employer against a union with whom the employer had entered into a § 8(f) prehire agreement. In reversing the D.C. Circuit, which had denied enforcement of the NLRB's cease and desist order which was based on the R.J. Smith construction of § 8(f), the Supreme Court clearly relied upon the deferential standard of review afforded to agency interpretations and held that the R.J. Smith construction of § 8(f) was a "defensible construction of the statute...." See Higdon, 434 U.S. at 350, 98 S.Ct. at 660. See also id. at 341, 98 S.Ct. at 656 ("[T]he Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purpose of the relevant statutory sections."). Indeed, the Court's deference to the Board's interpretation of § 8(f) is consistent with the Court's subsequent pronouncements concerning the judicial standard of review of an agency decision. See National R.R. Passenger Corp. v. Boston & Me. Corp., --- U.S. ----, ----, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992); Chevron U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).
 
 
 71
 However, the judicial deference afforded to an agency's construction of a statute has no place outside of the context of reviewing an agency decision. Unlike Higdon, McNeff was not on review from an order of the NLRB; rather, McNeff involved a lawsuit brought by a union against an employer pursuant to § 301 of the Labor Management Relations Act to recover payments of trust fund obligations due under a § 8(f) prehire agreement. At issue before the Supreme Court was "whether monetary obligations that have accrued under a prehire contract ... can be enforced, prior to the repudiation of such contract, in a [§ 301] suit brought by a union against an employer ... absent proof that the union represented a majority of the employees." McNeff, 461 U.S. at 262, 103 S.Ct. at 1754. In affirming the lower courts, which had recognized the validity of such a suit, the Court was required to interpret the statute, and interpreted it consistently with the interpretation approved of in Higdon. For example, in the course of rejecting the argument that a § 301 action "trench[ed] on the voluntary and voidable characteristics of a § 8(f) prehire agreement," the Court stated that
 
 
 72
 although the voidable nature of prehire agreements clearly gave petitioner the right to repudiate the contract, it is equally clear that the petitioner never manifested an intention to void or repudiate the contract.... Whatever may be required of a party wishing to exercise its undoubted right to repudiate a prehire agreement before the union attains majority support in the relevant unit, no appropriate action was taken by petitioner to do so in this case.
 
 
 73
 Id. 461 U.S. at 269-70, 103 S.Ct. at 1758-59 (emphasis added and footnote omitted). In its conclusion setting forth its holding, the McNeff Court stated in terms that could not be any clearer that the R.J. Smith construction of the statute was the law: "A § 8(f) prehire agreement is subject to repudiation until the union establishes majority status." Id. at 271, 103 S.Ct. at 1759.
 
 
 74
 I read the McNeff Court's interpretation of § 8(f) as essential to the Court's rejection of the petitioner's argument, and, as such, I do not believe that it can be dismissed as dicta. While McNeff relied on Higdon in construing § 8(f), the McNeff Court was not operating under the deferential standard of review applied in Higdon. The McNeff Court was resolving a lawsuit between private parties rather than reviewing an agency decision, and, as the majority concedes, nowhere in McNeff does the Court limit its interpretation of § 8(f) to being merely a defensible construction. What the majority fails to recognize is that the McNeff Court could not have proceeded from the deferential standard of review because it was not reviewing an agency decision. McNeff construed § 8(f) in order to resolve the issue before it, and, in doing so, its construction became the law. Mesa Verde, 861 F.2d at 1144 (Hug, J., dissenting). See also id. at 1137 (Wallace, J., dissenting). Indeed, our subsequent cases interpreting McNeff never portended that the meaning given to § 8(f) was merely a defensible construction; rather we applied the McNeff interpretation of § 8(f) as if it were the law. See Trustees of Wyo. Health & Welfare Plan v. Morgen & Oswood Constr. Co., Inc., 850 F.2d 613, 615 n. 2 (10th Cir.1988), Trustees of Colo. Statewide Ironworkers v. A & P Steel, Inc., 812 F.2d 1518, 1520-21 (10th Cir.1987); New Mexico Dist. Council of Carpenters v. Jordan & Nobles Constr. Co., 802 F.2d 1253, 1255 (10th Cir.1986).
 
 
 75
 Once the Supreme Court says what the law is, its interpretation binds not only us as a lower court but also the agency charged with administering that law until a contrary act of Congress or a Court decision overruling its earlier precedent. Thus, while we defer to an agency's defensible statutory interpretation, once the Supreme Court states what the law is, as it did in McNeff, the agency loses its authority to interpret the statute in a contrary, albeit reasonable, manner. This is not the case in which Congress has delegated rule-making authority over to an agency. See Mesa Verde, 861 F.2d at 1139-42 (Hug, J., dissenting). Rather, this is a case in which Congress has enacted a law, the Supreme Court has said what the law means, and the agency charged with administering the law has subsequently decided it means something entirely different. In relying on the NLRB's Deklewa interpretation of § 8(f), the majority is compelled to reason that the Supreme Court in McNeff did not mean what it said. I respectfully disagree and, therefore, dissent.
 
 
 
 [1]
 Viola Industries-Elevator Division and Viola Industries, Inc. were found by the Board to be alter egos. Viola Indus. Elevator Div., Inc., 286 N.L.R.B. 306, 307 (1987). They do not contest that finding here and so will be treated as a single entity, referred to as "Viola Industries."
 
 
 [2]
 See Jordan & Nobles, 802 F.2d at 1255; Colorado Statewide Iron Workers, 812 F.2d at 1520; and Wyoming Health, 850 F.2d at 622
 
 
 [3]
 Those views of the Third Circuit have been followed by four other circuits. See C.E.K. Indus. Mechanical Contractors, Inc. v. N.L.R.B., 921 F.2d 350, 357 (1st Cir.1990); N.L.R.B. v. Bufco Corp., 899 F.2d 608, 609 (7th Cir.1990); N.L.R.B. v. W.L. Miller Co., 871 F.2d 745, 748 (8th Cir.1989); and Mesa Verde Construction Co. v. Northern Cal. Dist. Council of Laborers, 861 F.2d 1124, 1126, 1134, 1137 (9th Cir.1988) (en banc)
 
 
 [4]
 See Consolidated Freightways v. N.L.R.B., 892 F.2d 1052, 1058 (D.C.Cir.1989); N.L.R.B. v. Semco Printing Ctr., Inc., 721 F.2d 886, 892 (2d Cir.1983); N.L.R.B. v. Bufco, 899 F.2d 608, 611 (7th Cir.1990); N.L.R.B. v. New Columbus Nursing Home, Inc., 720 F.2d 726, 729 (1st Cir.1983)
 
 
 [5]
 The coercion claim is considered as a separate issue in the panel opinion issued herewith and the panel rejects that claim as time-barred